Carolyn WARREN, et al., Appellants,

v.

DISTRICT OF COLUMBIA, et
al., Appellees.

Wilfred NICHOL, Appellant,

v.

DISTRICT OF COLUMBIA METROPOL-
ITAN POLICE DEPARTMENT, et
al., Appellees.

Nos. 79–6, 79–394.

District of Columbia Court of Appeals.

Argued En Banc April 13, 1981.

Decided Dec. 21, 1981.

Stephen A. Friedman, Washington, D. C.,
for appellants.

Charles L. Reischel, Deputy Corp. Coun-
sel, with whom Judith W. Rogers, Corp.
Counsel, and David P. Sutton, Asst. Corp.
Counsel, Washington, D. C., were on the
petition, for appellees.

Before NEWMAN, Chief Judge, and
KELLY, KERN, NEBEKER, HARRIS,
MACK and FERREN, Associate Judges.

**2** 

NEBEKER, Associate Judge:

Appellants Carolyn Warren, Miriam Douglas, and Joan Taliaferro in No. 79–6, and appellant Wilfred Nichol in No. 79–394 sued the District of Columbia and individual members of the Metropolitan Police Department for negligent failure to provide adequate police services. The respective trial judges held that the police were under no specific legal duty to provide protection to the individual appellants and dismissed the complaints for failure to state a claim upon which relief could be granted. Super. Ct.Civ.R. 12(b)(6). However, in a split decision a three-judge division of this court determined that appellants Warren, Taliaferro and Nichol were owed a special duty of care by the police department and reversed the trial court rulings. The division unanimously concluded that appellant Douglas failed to fit within the class of persons to whom a special duty was owed, and affirmed the lower court's dismissal of her complaint. The court en banc, on petitions for rehearing, vacated the panel's decision. After rearguments, notwithstanding our sympathy for appellants who were the tragic victims of despicable criminal acts, we affirm the judgments of dismissal.

*Appeal No. 79–6*

In the early morning hours of March 16, 1975, appellants Carolyn Warren, Joan Taliaferro, and Miriam Douglas were asleep in their rooming house at 1112 Lamont Street, N.W. Warren and Taliaferro shared a room on the third floor of the house; Douglas shared a room on the second floor with her four-year-old daughter. The women were awakened by the sound of the back door being broken down by two men later identified as Marvin Kent and James Morse. The men entered Douglas' second floor room, where Kent forced Douglas to sodomize him and Morse raped her.

Warren and Taliaferro heard Douglas' screams from the floor below. Warren telephoned the police, told the officer on duty that the house was being burglarized, and requested immediate assistance. The department employee told her to remain quiet and assured her that police assistance would be dispatched promptly. Warren's call was received at Metropolitan Police Department Headquarters at 6:23 a. m., and was recorded as a burglary in progress. At 6:26 a. m., a call was dispatched to officers on the street as a "Code 2" assignment, although calls of a crime in progress should be given priority and designated as "Code 1." Four police cruisers responded to the broadcast; three to the Lamont Street address and one to another address to investigate a possible suspect.

Meanwhile, Warren and Taliaferro crawled from their window onto an adjoining roof and waited for the police to arrive. While there, they saw one policeman drive through the alley behind their house and proceed to the front of the residence without stopping, leaning out the window, or getting out of the car to check the back entrance of the house. A second officer apparently knocked on the door in front of the residence, but left when he received no answer. The three officers departed the scene at 6:33 a. m., five minutes after they arrived.

Warren and Taliaferro crawled back inside their room. They again heard Douglas' continuing screams; again called the police; told the officer that the intruders had entered the home, and requested immediate assistance. Once again, a police officer assured them that help was on the way. This second call was received at 6:42 a. m. and recorded merely as "investigate the trouble"—it was never dispatched to any police officers.

Believing the police might be in the house, Warren and Taliaferro called down to Douglas, thereby alerting Kent to their presence. Kent and Morse then forced all three women, at knifepoint, to accompany them to Kent's apartment. For the next fourteen hours the women were held captive, raped, robbed, beaten, forced to commit sexual acts upon each other, and made to submit to the sexual demands of Kent and Morse.

Appellants' claims of negligence included: the dispatcher's failure to forward the 6:23 a. m. call with the proper degree of urgen-

cy; the responding officers' failure to follow standard police investigative procedures, specifically their failure to check the rear entrance and position themselves properly near the doors and windows to ascertain whether there was any activity inside; and the dispatcher's failure to dispatch the 6:42 a. m. call.

*Appeal No. 79–394*

On April 30, 1978, at approximately 11:30 p. m., appellant Nichol stopped his car for a red light at the intersection of Missouri Avenue and Sixteenth Street, N.W. Unknown occupants in a vehicle directly behind appellant struck his car in the rear several times, and then proceeded to beat appellant about the face and head breaking his jaw.

A Metropolitan Police Department officer arrived at the scene. In response to the officer's direction, appellant's companion ceased any further efforts to obtain identification information of the assailants. When the officer then failed to get the information, leaving Nichol unable to institute legal action against his assailants, Nichol brought a negligence action against the officer, the Metropolitan Police Department and the District of Columbia.

■ The trial judges correctly dismissed both complaints. In a carefully reasoned Memorandum Opinion, Judge Hannon based his decision in No. 79–6 on "the fundamental principle that a government and its agents are under no general duty to provide public services, such as police protection, to any particular individual citizen." *See* p. 4, *infra*. The duty to pro-

vide public services is owed to the public at large, and, absent a special relationship between the police and an individual, no specific legal duty exists. Holding that no special relationship existed between the police and appellants in No. 79–6, Judge Hannon concluded that no specific legal duty existed. We hold that Judge Hannon was correct and adopt the relevant portions of his opinion. Those portions appear in the following Appendix.[1]

■ Judge Pryor, then of the trial court, ruled likewise in No. 79–394 on the basis of Judge Hannon's opinion. In No. 79–394, a police officer directed Nichol's companion to cease efforts to identify the assailants and thus to break off the violent confrontation. The officer's duty to get that identification was one directly related to his official and general duty to investigate the offenses. His actions and failings were solely related to his duty to the public generally and possessed no additional element necessary to create an overriding special relationship and duty.[2]

Here the effort to separate the hostile assailants from the victims—a necessary part of the on-scene responsibility of the police—adds nothing to the general duty owed the public and fails to create a relationship which imposes a special legal duty such as that created when there is a course of conduct, special knowledge of possible harm, or the actual use of individuals in the investigation. *See Falco v. City of New York*, 34 A.D.2d 673, 310 N.Y.S.2d 524 (App. Div.1970), *aff'd*, 29 N.Y.2d 918, 329 N.Y. S.2d 97, 279 N.E.2d 854 (1972) (police offi-

1. Having based his dismissal on an absence of duty, Judge Hannon found it unnecessary to decide the adequacy of the notice to the District of Columbia under D.C.Code 1973, § 12–309. Consequently, we do not review that issue on appeal.

2. It can be seen from cases in which a special duty has been found that an additional element has been injected above the existing general public duty. *E.g., Florence v. Goldberg*, 44 N.Y.2d 189, 404 N.Y.S.2d 583, 375 N.E.2d 763 (1978) (school crossing guard course of conduct and police requiring replacement of absent guard together with reliance); *McCorkle v. City of Los Angeles*, 70 Cal.2d 252, 74 Cal.Rptr.

389, 449 P.2d 453 (1969) (en banc) (use of auto accident victim to aid police investigation by walking to point of impact in street); *Johnson v. States*, 69 Cal.2d 782, 73 Cal.Rptr. 240, 447 P.2d 352 (1968) (en banc) (placement of youth with known homicidal tendencies in foster home); *Gardner v. Village of Chicago Ridge*, 71 Ill.App.2d 373, 219 N.E.2d 147 (1966) (return of victim to scene for "show up" identification of still violent assault suspects); *Schuster v. City of New York*, 5 N.Y.2d 75, 180 N.Y.S.2d 265, 154 N.E.2d 534 (1958) (recruitment of citizen informant in national organized violent crime case).

cer's statement to injured motorcyclist that he would obtain name of motorist who struck the motorcycle was a gratuitous promise and did not create a special legal duty); *Jackson v. Heyman*, 126 N.J.Super. 281, 314 A.2d 82 (Super.Ct.Law Div.1973) (police officers' investigation of vehicle accident where pedestrian was a minor child did not create a special legal duty to child's parents who were unsuccessful in their attempt to recover damages because police failed to identify drivers of vehicle). We hold that Judge Pryor did not err in dismissing No. 79–394 for failure to state a claim.

In either case, it is easy to condemn the failings of the police. However, the desire for condemnation cannot satisfy the need for a special relationship out of which a duty to specific persons arises. In neither of these cases has a relationship been alleged beyond that found in general police responses to crimes. Civil liability fails as a matter of law.

### APPENDIX

### SUPERIOR COURT OF THE DISTRICT OF COLUMBIA CIVIL DIVISION

Civil Action No. 4695–76

CAROLYN WARREN, et al., Plaintiffs,

v.

DISTRICT OF COLUMBIA, et al., Defendants.

### MEMORANDUM OPINION

\* \* \*

The Court, however, does not agree that defendants owed a specific legal duty to plaintiffs with respect to the allegations made in the amended complaint for the reason that the District of Columbia appears to follow the well-established rule that official police personnel and the government employing them are not generally liable to victims of criminal acts for failure to provide adequate police protection. *Compare Rieser v. District of Columbia*, 183 U.S.App.D.C. 375, 390–91, 563 F.2d 462, 477–78 (1977) (rehearing *en banc*

granted and panel opinion vacated on other grounds; panel opinion reinstated in pertinent part, 188 U.S.App.D.C. 384, 580 F.2d 641 [647] (1978)); *Westminster Investing Corp. v. G. C. Murphy Co.*, 140 U.S.App. D.C. 247, 259–50, 434 F.2d 521, 523–24 (1970) and *Yohanan v. Wells*, No. 78–0671 (D.D.C. June 28, 1978), *with Massengill v. Yuma County*, 104 Ariz. 518, 456 P.2d 376 (1969) (*en banc*); *Riss v. City of New York*, 22 N.Y.2d 579, 293 N.Y.S.2d 897, 240 N.E.2d 860 (1968); Annot., 46 A.L.R.3d 1084 (1972) and Annot., 41 A.L.R.3d 700 (1972). This uniformly accepted rule rests upon the fundamental principle that a government and its agents are under no general duty to provide public services, such as police protection, to any particular individual citizen. *Turner v. United States*, 248 U.S. 354, 357–58, 39 S.Ct. 109, 110, 63 L.Ed. 291 (1919); *Rieser v. District of Columbia, supra.*

A publicly maintained police force constitutes a basic governmental service provided to benefit the community at large by promoting public peace, safety and good order. The extent and quality of police protection afforded to the community necessarily depends upon the availability of public resources and upon legislative or administrative determinations concerning allocation of those resources. *Riss v. City of New York, supra.* The public, through its representative officials, recruits, trains, maintains and disciplines its police force and determines the manner in which personnel are deployed. At any given time, publicly furnished police protection may accrue to the personal benefit of individual citizens, but at all times the needs and interests of the community at large predominate. Private resources and needs have little direct effect upon the nature of police services provided to the public. Accordingly, courts have without exception concluded that when a municipality or other governmental entity undertakes to furnish police services, it assumes a duty only to the public at large and not to individual members of the community. *E.g., Trautman v. City of Stamford*, 32 Conn.Supp. 258, 350 A.2d 782 (1975); *Henderson v. City of St. Petersburg*, 247 So.2d

23 (Fla.Dist.Ct.App.1971); *Massengill v. Yuma County, supra*, and *Riss v. City of New York, supra.* Dereliction in the performance of police duties may, therefore, be redressed only in the context of a public prosecution and not in a private suit for money damages. *Massengill, supra.*

This rule of duty owed to the public at large has been most frequently applied in cases involving complaints of inadequate protection during urban riots or mob violence. Many of these cases challenge the preparedness of the police to handle such situations, while others, such as *Westminster Investing Corp. v. G. C. Murphy Co., supra*, challenge the tactical decisions made to curtail or remove police protection from the riot areas. In *Westminster*, officials of the Metropolitan Police Department of the District of Columbia had decided to limit police presence in the area of the Murphy Company's store during the firey 1968 riots. Murphy's store was destroyed and the company filed a claim against the District of Columbia contending that the police department had deliberately or negligently abandoned its policing obligations during the riots and thereby permitted rioters to destroy Murphy's property. In affirming the dismissal of Murphy's claim against the District, the United States Court of Appeals for the District of Columbia Circuit held that the District of Columbia had no direct legal obligation to Murphy and that Murphy, therefore, had "no substantive right to recover the damages resulting from failure of [the] government or its officers to keep the peace." *Id.* at 252, 434 F.2d at 526, *quoting Turner v. United States, supra* [248 U.S.] at 358 [39 S.Ct. at 110].

Courts have also found no private duty and no liability in an assortment of other situations which involved allegedly inadequate police protection. In *Henderson v. City of St. Petersburg, supra*, plaintiff had contacted the St. Petersburg police department and made arrangements for specific police protection while making deliveries in a dark and secluded part of the city. Plaintiff had been previously attacked while making such deliveries and, accordingly, relied upon the assurances of police personnel that officers would be on the scene. Following carefully the instructions given him by the police, plaintiff was, nonetheless, shot by assailants. The order dismissing plaintiff's complaint against the city was affirmed on the grounds that, in the absence of a special relationship, not present in the case, the police department was under no duty to protect plaintiff Henderson.

It was in *Massengill v. Yuma County, supra*, that the Arizona Supreme Court, in a unanimous en banc decision, affirmed the dismissal of a complaint alleging that a deputy sheriff and the county employing him were negligent in failing to apprehend two reckless drivers. According to the complaint, the deputy sheriff saw two youths leave a local tavern and drive their cars away at excessive speeds. The deputy sheriff then allegedly followed the two cars, watching them weave back and forth, drive on the wrong side of the road and attempt to pass on a hill. The officer made no attempt to apprehend the drivers or prevent their reckless conduct. Shortly thereafter the two reckless drivers collided with an oncoming vehicle causing the deaths of five of the six persons involved. The Arizona Superior Court had concluded that the duty of defendants to arrest the reckless drivers was a duty owed to the general public and not to the deceased occupants of the oncoming vehicle. The Arizona Supreme Court agreed. *Accord, Trautman v. City of Stamford, supra.* [Footnote 1 omitted.]

The general duty owed to the public may become a specific duty owed to an individual if the police and the individual are in a special relationship different from that existing between the police and citizens generally. Thus, when the New York police department solicited confidential information to aid in apprehension of gangster Willie Sutton, the police assumed a special duty to the informant who came forward. *Schuster v. City of New York*, 5 N.Y.2d 75, 180 N.Y.S.2d 265, 154 N.E.2d 534 (1958). Similarly, a special relationship was created when the police arranged a confrontation between a suspect and a witness to a crime,

thereby giving the suspect an opportunity to assault the witness. *Gardner v. Village of Chicago Ridge*, 71 Ill.App.2d 373, 219 N.E.2d 147 (1966). In *McCorkle v. City of Los Angeles*, 70 Cal.2d 252, 74 Cal.Rptr. 389, 449 P.2d 453 (1969), a police officer investigating a traffic accident led plaintiff into the middle of the highway where plaintiff was then struck by another car. The California Court found that a special duty had been created by the officer's affirmative conduct. Likewise, a parole officer was held to have been in a special relationship with individuals operating a foster home and, therefore, under an obligation to disclose the violent character of a juvenile whom he sought to place in the foster home. *Johnson v. State*, 69 Cal.2d 782, 73 Cal.Rptr. 240, 447 P.2d 352 (1968).[2] The United States Court of Appeals for the District of Columbia recognized a similar special relationship between a governmental hospital and the family of a violent, assaultive patient who the hospital planned to discharge and who the hospital knew had previously attacked family members. *Hicks v. United States*, 167 U.S.App.D.C. 169, 511 F.2d 407 (1975).

Plaintiffs in this action contend that they, too, entered a special relationship with the police when Warren and Taliaferro telephoned to request assistance. Courts which have had the opportunity to consider comparable situations have concluded that a request for aid is not in itself sufficient to create a special duty. In *Riss v. City of New York, supra*, the plaintiff had complained to the police numerous times about a rejected suitor who had threatened her repeatedly. In response to plaintiff's desperate pleas for help, the police rendered only nominal assistance and refused to help plaintiff further. Plaintiff received a "last chance" threat from the suitor and once

more called the police without success. The following day, the suitor carried out his threat by "having a hired thug throw lye in [plaintiff's] face." *Id.* at 584, 293 N.Y.S.2d at 900, 240 N.E.2d at 862. Distinguishing *Schuster v. City of New York, supra*, the Court held that plaintiff's pleas for help did not create a special relationship between herself and the police and could not serve as the basis of liability.

The plaintiff in *Antique Arts Corporation v. City of Torrance*, 39 Cal.App.3d 588, 114 Cal.Rptr. 332 (1974), arranged to have its burglar alarm directly wired to the Torrance police station. Plaintiff contended that the alarm went off during the course of a burglary but the police dispatcher negligently delayed ten minutes before transmitting the alert, thereby allowing the burglars to escape with plaintiff's goods. Plaintiff argued that the alarm hookup created a special relationship with the police, but the Court rejected this contention, concluding that "an alert from an alarm, irrespective of how transmitted, is no more than a complaint that a crime has been or is being committed." *Id.* at 592, 114 Cal.Rptr. at 334.

As noted above, the Florida Appeals Court dismissed the complaint in *Henderson v. City of St. Petersburg, supra*, notwithstanding plaintiff's having requested and specifically discussed plans for police protection. After reviewing cases in which the police or other government agency were under a 'special duty' different from that owed to the public generally, the Florida Court concluded that a request for police protection, even when accompanied by a promise that protection would be provided, does not create the "special duty" necessary to establish tort liability. *Id.* at 25.

Plaintiffs have adopted a more novel theory in an attempt to distinguish this case from those discussed above. Plaintiffs con-

---

2. A similar factual situation is presented in *Rieser v. District of Columbia, supra*. This case involved a woman who was raped and murdered by a District of Columbia parolee who had been assisted by a parole officer in obtaining employment at the apartment complex where the murder took place. The decedent's father filed suit for damages under the

District of Columbia Wrongful Death Act against the owners of the apartment complex, the parolee, the parole officer and the District of Columbia. The Court of Appeals, MacKinnon, Circuit Judge, held *inter alia* that an actionable duty exists where a special relationship has been established between the governmental unit and plaintiff.

tend that although the Metropolitan Police Department may not have been under a specific duty to these plaintiffs at the time of the initial telephone complaint, the police undertook an obligation by taking some action toward rendering assistance. Plaintiffs seem to be saying that no liability would have attached had the police operator refused plaintiffs' call, had the dispatcher refused to transmit the message, or had the officers refused to respond. However, plaintiffs' argument continues, once the operator, dispatcher and officers took some action to assist plaintiffs, they all became personally answerable in money damages for failing to render assistance adequate to meet plaintiffs' needs. Without any supporting authority, plaintiffs contend that defendant police employees were "at least" in the position of volunteers and must be held liable as volunteers for any damages resulting from their negligent omissions. Plaintiffs' argument misapprehends both the legal status of the police officer and the legal status of the volunteer.

In the classic case, *H. R. Moch Co., Inc. v. Rensselaer Water Co.*, 247 N.Y. 160, 159 N.E. 896 (1928), then Judge Cardozo delineated the liability of a volunteer:

> It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all . . . . The hand once set to a task may not always be withdrawn with impunity though liability would fail if it had never been applied at all. . . . If conduct has gone forward to such a stage that inaction would commonly result, not negatively merely in withholding a benefit, but positively or actively in working an injury, there exists a relation out of which arises a duty to go forward. [*Id.* at 167, 159 N.E. at 898.]

The *Moch* case involved a suit against a water company for failure to supply adequate water to fight a city fire. Judge Cardozo found that the failure to provide adequate water to fight the fire constituted, at most, a nonactionable withholding of a benefit. Whatever the omissions and failures of the defendant police officers in this action, those alleged omissions and failures, too, constituted no more than a similar withholding of a benefit.

Moreover, volunteer liability is premised in large part upon the assumption that the volunteer is free to assess each rescue situation, weigh the risks involved, and determine whether to shoulder the obligation or leave it to someone else.[3] Police officers clearly are not in a position to make such choices on a case by case basis and it would be absurd to presume that an individual assumes a permanent "volunteer" status when he becomes a police officer. Again, in the words of Judge Cardozo:

> An intention to assume an obligation of indefinite extension to every member of the public is seen to be the more improbable when we recall the crushing burden that the obligation would impose . . . . A promisor will not be deemed to have had in mind the assumption of a risk so overwhelming for any trivial reward. [*Id.* at 165–166, 159 N.E. at 897–98.]

Plaintiffs have also construed the issues in this case as giving rise to "negligent performance of police duties." In an attempt to avoid the overwhelming case law barring private suits over negligent omissions in the performance of police duties, plaintiffs seek to bring this action within the orbit of cases allowing recovery for injuries caused by negligent acts of police officers in the performance of their official duties. The cases cited by plaintiffs include the negligent handling of a police dog, negligent operation of a police vehicle, and the negligent use of a police weapon. Such cases involve acts of affirmative negligence, for which anyone—police or civilian—would be liable: negligent handling of an attack dog, negligent operation of a motor vehicle, and negligent use of a firearm. Those acts

---

**3.** The District of Columbia Court of Appeals recently refrained from implying an adoption of the rescue doctrine in this jurisdiction. *Gillespie v. Washington*, D.C.App., 395 A.2d [18] 21 (1978). This Court's discussion of the rescue doctrine and its applicability to plaintiffs' claim should likewise not be considered an adoption of the doctrine.

of ordinary negligence do not change in character because they happen to have been committed by a police officer in the course of his duties. However, the allegations of negligence in the present case derive solely from defendants' status as police employees and from plaintiffs' contention that defendants failed to do what reasonably prudent police employees would have done in similar circumstances. The difference is between ordinary negligence on the one hand and a novel sort of professional malpractice on the other. A person does not, by becoming a police officer, insulate himself from any of the basic duties which everyone owes to other people, but neither does he assume any greater obligation to others individually. The only additional duty undertaken by accepting employment as a police officer is the duty owed to the public at large.

The public duty concept has drawn some criticism for purportedly creating the rule that: " 'Because we owe a duty to everybody, we owe it to nobody.' " *Riss v. City of New York, supra* at 585, 293 N.Y.S.2d at 901, 240 N.E.2d at 862 (Keating, J., dissenting). A duty owed to the public, however, is no less enforceable because it is owed to "everybody." Public officials at all levels remain accountable to the public and the public maintains elaborate mechanisms to enforce its rights—both formally in the courts and less formally through internal disciplinary proceedings. In the case of the Metropolitan Police Department, officers are subject to criminal charges and a penalty of two years imprisonment for failure to arrest law breakers. D.C.Code 1973, § 4–143. Additionally, officers are answerable to their superiors and ultimately to the public through its representatives, for dereliction in their assigned duties. D.C.Code 1973, § 4–121.

The absence of a duty specifically enforceable by individual members of the community is not peculiar to public police services. Our representative form of government is replete with duties owed to everyone in their capacity as citizens but not enforceable by anyone in his capacity as an individual. Through its representatives, the public creates community service; through its representatives, the public establishes the standards which it demands of its employees in carrying out those services and through its representatives, the public can most effectively enforce adherence to those standards of competence. As members of the general public, individuals forego any direct control over the conduct of public employees in the same manner that such individuals avoid any direct responsibility for compensating public employees.

Plaintiffs in this action would have the Court and a jury of twelve additional community representatives join in the responsibility of judging the adequacy of a public employee's performance in office. Plaintiffs' proposition would lead to results which the *Massengill* Court aptly described as "staggering." *Massengill v. Yuma County, supra* at 523, 456 P.2d at 381. In this case plaintiffs ask the Court and jury to arrogate to themselves the power to determine, for example, whether defendant Officer Thompson acted in a manner consistent with good police practice when he volunteered to stake out a suspect's house rather than volunteering to report to the crime scene. Consistent with this contention then, should a Court and jury also undertake to sift through clues known to the police in order to determine whether a criminal could reasonably have been apprehended before committing a second crime? Should a Court also be empowered to evaluate, in the context of a tort action, the handling of a major fire and determine whether the hoses were properly placed and the firemen correctly allocated? Might a Court also properly entertain a tort claim over a school teacher's ability to teach seventh grade English or over a postman's failure to deliver promptly an important piece of mail?

Establishment by the Court of a new, privately enforceable duty to use reasonable diligence in the performance of public functions would not likely improve services rendered to the public. The creation of direct, personal accountability between each government employee and every member of the community would effectively bring the

business of government to a speedy halt, "would dampen the ardor of all but the most resolute, or the most irresponsible in the unflinching discharge of their duties,"[4] and dispatch a new generation of litigants to the courthouse over grievances real and imagined. An enormous amount of public time and money would be consumed in litigation of private claims rather than in bettering the inadequate service which draws the complaints. Unable to pass the risk of litigation costs on to their "clients," prudent public employees would choose to leave public service.

Although recognizing the obligation of public employees to perform their duties fully and adequately, the law properly does not permit that obligation to be enforced in a private suit for money damages. Accordingly, the Court concludes that plaintiffs have failed to state claims upon which relief may be granted and accordingly, the action is dismissed as to all defendants. [Footnote 5 omitted.]

JOSEPH M. HANNON
Judge

Dated: November 21, 1978

KELLY, Associate Judge, with whom MACK, Associate Judge, joins, concurring in part and dissenting in part:

The basic premise underlying the dismissals of these complaints is correct: unless a "special duty" to a particular individual can be shown, public officials and governmental units owe only a general, nonactionable duty to members of the public to provide services such as fire and police protection. *Chandler v. District of Columbia*, D.C.App., 404 A.2d 964 (1979); *Duran v. City of Tucson*, 20 Ariz.App. 22, 509 P.2d 1059 (1973); *Trautman v. City of Stamford*, 32 Conn. Supp. 258, 350 A.2d 782 (1975); *Trujillo v. City of Albuquerque*, 93 N.M. 564, 603 P.2d 303 (App.1979); 18 E. McQuillan, Municipal Corporations §§ 53.04a, b (3d ed. 1977). As stated in 2 T. Colley, Law of Torts:

The rule of official responsibility, then, appears to be this: That if the duty which the official authority imposes upon an officer is a duty to the public, a failure to perform it, or an inadequate or erroneous performance, must be a public, not an individual injury, and must be redressed, if at all, in some form of public prosecution. On the other hand, if the duty is a duty to the individual, then a neglect to perform it, or to perform it properly, is an individual wrong, and may support an individual action for damages. "The failure of a public officer to perform a public duty can constitute an individual wrong only when some person can show that in the public duty was involved also a duty to himself as an individual, and that he has suffered a special and peculiar injury by reason of its nonperformance." [*Id.* § 300, at 385–86 (4th ed. 1932); citation and footnotes omitted.]

This general duty/special duty dichotomy is illustrated by our decision in *Chandler v. District of Columbia, supra*. There, the District of Columbia, for financial reasons, decided to close several randomly chosen fire stations, one of which was near Mrs. Chandler's home. After a fire broke out in her home and her two children died from smoke inhalation, Mrs. Chandler sued for wrongful death, alleging that her children's deaths resulted from the District's negligence in closing the fire station. Recognizing the general rule of municipal nonliability, this court found that the facts of Mrs. Chandler's case did not give rise to a special duty or "special relationship." *Id.* at 966–67. By way of further analysis, fire protection services are meant to benefit the community as a whole, and because Mrs. Chandler's children were members of the general public, with nothing to single them out as specific individuals to whom a duty was owed, no special duty had arisen. Without the critical element of duty, an action in negligence does not lie.[1]

---

4. *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949).

1. The *Chandler* case was also decided on the basis of sovereign immunity; because the decision to close the stations was a discretionary act, the city could not be sued. *Id.* at 966. *See generally Wade v. District of Columbia*, D.C. App., 310 A.2d 857 (1973) (en banc).

The same reasoning applies in police protection cases. For example, in *Trautman v. City of Stamford, supra,* a plaintiff who was struck by a car while standing on a public sidewalk sued the city and two police officers, alleging a negligent failure to stop drag racing on the street adjacent to the sidewalk. In finding that no special duty was owed the plaintiff, the court stated, "the allegations of the instant case nowhere assert any conduct directed specifically by the defendant police officers toward the plaintiff individually. The conduct of the defendant patrolmen is directed ... toward the general public of which the plaintiff happened to be a part at the time in question." *Id.* 32 Conn.Supp. at 259, 350 A.2d at 783. The same rule has been applied in finding no special duty to protect a young man from violence in a city park, *Trujillo v. City of Albuquerque, supra*; to warn a motel employee of suspicious persons in the motel parking lot, *Sapp v. City of Tallahassee,* 348 So.2d 363 (Fla.Dist.Ct.App.1977); to arrest a drunk driver whose car collided with the plaintiff's decedent's car, *Massengill v. Yuma County,* 104 Ariz. 518, 456 P.2d 376 (1969); to protect a young lady from the threats of her estranged boyfriend, *Riss v. City of New York,* 22 N.Y.2d 579, 293 N.Y.S.2d 897, 240 N.E.2d 860 (1968); and to protect property during a civil disturbance, *Westminster Investing Corp. v. G. C. Murphy Co.,* 140 U.S.App.D.C. 247, 434 F.2d 521 (1970).

The general, nonactionable duty to provide police services may narrow, however, to a special, actionable duty if two factors are present. First, there must be some form of privity between the police department and the victim that sets the victim apart from the general public. *See, e.g., City of Tampa v. Davis,* 226 So.2d 450, 454 (Fla.Dist.Ct.App.1969). That is, the victim must become a reasonably foreseeable plaintiff. Second, there must be specific assurances of protection that give rise to justifiable reliance by the victim. *See, e.g., Sapp ·v. City of Tallahassee, supra* at 365–66.

In *Bloom v. City of New York,* 78 Misc.2d 1077, 357 N.Y.S.2d 979 (1974), several store owners sued the city for negligent failure to protect their property during a civil disturbance in 1968. The complaints alleged that city officials gave specific assurances of police protection, but negligently failed to take steps to carry out the promises. The city moved to dismiss the complaint, relying on the general rule of municipal nonliability. The court denied the motion, easily distinguishing the case from those cases in which there is no special duty:

> In the case at bar it is alleged that the plaintiffs were ready, willing and able to protect their premises but that they were restrained by the police who assured them that proper police protection would be provided. There is therefore alleged an affirmative series of acts by which the city assumed a special duty .... [*Id.* at 1078, 357 N.Y.S.2d at 981.]

*See also Silverman v. City of Fort Wayne,* 171 Ind.App. 415, 357 N.E.2d 285 (Ind.App. 1976) (dismissal of negligence complaint arising from failure to protect property during riot reversed in light of personal promise of protection).[2]

In *Florence v. Goldberg,* 44 N.Y.2d 189, 404 N.Y.S.2d 583, 375 N.E.2d 763 (1978), the police department voluntarily assigned a school crossing guard to cover a particularly busy intersection in Brooklyn. For the first two weeks of school, the infant plaintiff's mother accompanied him to school and saw a guard at the intersection every day. When the mother accepted employment, she sent the child to school by himself, relying on the guard's presence at the intersection.

As the *Chandler* court noted, the questions of sovereign immunity and duty require separate analysis. *Chandler, supra* at 966. No question of sovereign immunity is raised in these appeals.

2. The allegations of specific assurances of protection in *Bloom* and *Silverman* distinguish those cases from *Westminster Investing Corp. v. G. C. Murphy Co., supra,* a case relied on by the trial judge in No. 79–6. The plaintiffs in *Westminster* were members of the general public, to whom no promises of protection had been made, and to whom the District therefore owed no special duty.

One day, the guard was ill and the police department failed to provide a replacement or to notify school officials that there would be no guard at the crossing. The child was struck by a taxi cab as he tried to cross the street alone; the mother sued the city in negligence. Upholding a jury verdict for the child, the court emphasized two factors distinguishing that case from general duty cases. First, the duty assumed by the police was a limited one; it was directed toward a specific class of individuals rather than toward the public in general. *Id.* at 196–97, 404 N.Y.S.2d at 587, 375 N.E.2d at 767. Second, the mother had witnessed the provision of services and had relied to her detriment on the guard's performance. *Id.* The combination of these two factors led the court to conclude that the general duty to provide police services had become a special duty owed to that child.[3]

As both the *Bloom* and *Florence* courts noted, the concept of special duty is actually no more than an application of the cardinal principal of tort law that, even where no duty to act may exist originally, once one undertakes to act, he has a duty to do so with due care. *Florence v. Goldberg, supra* at 196, 404 N.Y.S.2d at 587, 375 N.E.2d at 766; *Bloom v. City of New York, supra* at 1079, 357 N.Y.S.2d at 981. *Cf. Security National Bank v. Lish*, D.C.App., 311 A.2d 833, 834 (1973) ("[o]ne who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all.") (quoting *Glanzer v. Shepard*, 233 N.Y. 236, 239, 135 N.E. 275, 276 (1922)). More precisely, one who begins to perform a service to another, whether gratuitously or not must perform with reasonable care; thus, he subjects himself to liability for any harm suffered because the other reasonably and foreseeably relied upon the actor's performance. *See* W. Prosser, The Law of Torts § 56 (4th ed. 1972); 2 F. Harper and F. James, The Law

of Torts § 18.6 (1956); 2 Restatement (Second) of Torts § 323 (1965). In the words of Chief Judge Cardozo:

> If conduct has gone forward to such a stage that inaction would commonly result, not negatively merely in withholding a benefit, but positively or actively in working an injury, there exists a relation out of which arises a duty to go forward. [*Moch Co. v. Rensselaer Water Co.*, 247 N.Y. 160, 167, 159 N.E. 896, 898 (1928); citation omitted.]

This is not, of course, a theory of strict liability; the actor need only do that which is reasonable under the circumstances. Prosser, *supra.*

To summarize, there are two prerequisites to a finding of a special duty. First, there must be direct contact or some other form of privity between the victim and the police department so that the victim becomes a reasonably foreseeable plaintiff. Second, there must be specific assurances of police services that create justifiable reliance by the victim. Without both of these elements, the duty to provide police services remains a general, nonactionable duty to the public at large.

## II

In reviewing the trial courts' grants of the motions to dismiss, "we must accept every well-pleaded allegation of material fact . . . as true and indulge all reasonable inferences which may arise therefrom." *Early Settlers Insurance Co. v. Schweid*, D.C.App., 221 A.2d 920, 922 (1966). The dismissals will be sustained only if it appears "beyond doubt that the plaintiff[s] can prove no set of facts in support of [their claims] which would entitle [them] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). *See also Owens v. Tiber Island Condominium Association*, D.C.App., 373 A.2d 890, 893 (1977).

---

**3.** Appellees attempt to distinguish *Florence* from the case at bar by arguing that the police in *Florence* breached a statutory duty to provide crossing guards. It is clear from the opinion, however, that the police department regulations referred to by appellees dealt only with the procedures to be followed if a school guard, once gratuitously assigned, was unable to report for duty. The initial assumption of the duty to provide a crossing guard was completely voluntary. *Florence, supra* 44 N.Y.2d at 196, 404 N.Y.S.2d at 587, 375 N.E.2d at 767.

Under this standard of review, I would hold that the complaints of appellants Warren, Taliaferro (No. 79–6), and Nichol (No. 79–394), contain facts that, if proved, are sufficient to establish that the Police Department owed each a special duty. Appellants Warren's and Taliaferro's urgent telephone calls to the Metropolitan Police Department removed them from the broad class of the general public. Appellant Nichol's direct contact with the officer on the scene of the assault made him a reasonably foreseeable plaintiff. Any duty assumed by the police from those points on was not a duty to the community as a whole, but a specific duty to identifiable persons.

All three of these appellants have also alleged specific assurances of police protection that may have created justifiable reliance on their parts. When a police department employee tells frantic callers that help is on the way, as in No. 79–6, or that he will obtain vital information for an injured person, as in No. 79–394, it is reasonably foreseeable that the persons so assured may forego, to their detriment, other avenues of help. Once the police embarked upon services under circumstances where it was reasonably foreseeable that a citizen might rely on their performance, they assumed a duty to perform with due care.

Appellant Douglas does not fit within the class of persons to whom a special duty was owed. Although she arguably meets the first prerequisite,[4] she does not fulfill the second. Because she was unaware of either the telephone calls to the police or the police's assurances to the other women, she could not have justifiably relied to her detriment on those assurances. Therefore, the dismissal as to her must be affirmed.

I do not ignore appellees' "floodgates of litigation" argument and have carefully considered the trial judge's fear that "[t]he creation of a direct, personal accountability between each government employee and every member of the community would effec-

tively bring the business of government to a speedy halt . . . and dispatch a new generation of litigants to the courthouse over grievances real and imagined."[5] The duty which I recognize in this opinion will not create such broad liability. Moreover, the argument

assumes that a strict liability standard is to be imposed and that the courts would prove completely unable to apply general principles of tort liability in a reasonable fashion in the context of actions arising from the negligent acts of police . . . personnel. The argument is . . . made as if there were no such legal principles as fault, proximate cause or foreseeability, all of which operate to keep liability within reasonable bounds. No one is contending that the police must be at the scene of every potential crime . . . . They need only act as a reasonable man would under the circumstances. [*Riss v. City of New York, supra* at 586, 293 N.Y.S.2d at 902, 240 N.E.2d at 863 (Keating, J., dissenting).]

In my judgment, the complaints of appellants Warren, Taliaferro and Nichol contain sufficient facts from which they may prove that a special duty was owed to them; consequently, the trial judges erred in dismissing their complaints for failure to state a claim upon which relief could be granted. To me, also, gratuitous comments about condemning the recognized "failings" of the police in these cases is no substitute for an independent and objective decisional analysis of an important and sensitive issue.

NEWMAN, Chief Judge, concurring in part and dissenting in part:

I concur in the majority opinion as to appellant Nichol (No. 79–394). I join the dissent as to appellants Warren, Douglas and Taliaferro (No. 79–6).

---

4. *Whether she removed herself from the class of the general public is, as stated, a factual question: from the point of view of the police department, with its knowledge from the telephone call, was appellant Douglas a foreseea-* ble victim or merely still a member of the general public?

5. *See* Appendix *infra* at 4.